Judge Mills,
dissenting from the majority of the court, in the decision that the lands of the defendant in the adversary possesion of others are not subject to sale der the fieri facias, delivered his own opinion.
Ti-ie question, whether lands possessed, at the time of sale, adversely to the holder of the legal estate, can be sold by execution as his property, is one, which among the conflicting state of land titles in the country, must have occurred frequently; and if it had been a serious one, or one of great doubt, could not have slept without adjudication hitherto. It must now, however, be decided by the sound construction of the acts, subjecting lands to the payment of debts; and I cannot doubt that they authorize the sale.
The first expression worthy of notice, 1 Dig. L. K. 513, directs the sheriff having the execution, to make the money “of the lands, tenements and hereditaments, in possession, reversion, or remainder” belonging to the debtor. What means this description of “possession, reversion or remainder?” Does it intend the lands actually possessed? I cannot convict myself of inconsistency, by saying it does. The case of May’s heirs vs. Slaughter, 3 Marshall, 505, has fixed the meaning of those expressions in a similar statute — to-wit: in the statute of wills. This latter statute directs what kind of real estate a man can devise by will, and describes it by the words “possession, reversion, or remainder.” The statute we are now considering, points out what kind of real estate the sheriff can sell by execution, and describes it by the same words; “possession, reversion, or remainder.” We have said in the first instance, that the word “possession” did not describe the actual state of the lands at the moment, but the nature of the tenure, and therefore, if the evidences of title showed a present interest, the devisor might devise it an adverse possession notwithstanding, Shall I in the last case say, that the same word does not mean the same thing, but intends adverse possession at the moment, and therefore, the lands cannot be sold? Try the matter as we will, the words in both statutes are the *486 sariic, and applied to the same subject, and affixing" different meanings to them in our statute, from what is affixed in the other, cannot be reconciled. It follows therefore, that the word “possession” means a present interest by the nature of the title, as opposed to remainders, reversions, contingent or possible estates, and that an execution can sell it according to the letter and spirit- of the act.
Judge Mills’ dissent.
The next expressions of the act, defining the interest which can be sold, are- still more clear and decisive.' They are these: “If the owner shall not pay the debt, or damages, and costs, before, or at the day of sale, the sheriff or officer shall proceed to sell the lands, tenements and hereditaments, or such estate and interest, as the party convict shall’ have therein.” 1 Dig. L. K. 514. These expressions exclude the conclusion that any interest is excepted: The mind is brought to the inquiry, has the debtor-any interest? That the debtor had in the present instance, cannot be denied, so long as the’ legal doctrine prevails, that one may have the mere right and the right of possession, while another has the actual possession. Such interest, therefore,, can be sold; otherwise, much of the lands of the country, will by mere construction be exempted from, execution to pay debts. They cannot be sold as the property of the real owner, because they are adr versely possessed; nor as the property of the possessor, because he has no title. Lands thus situated, are therefore, better protected from debt, than by all the devices heretofore invented. Let the debtor permit his lands to fall into the possession of an adverse holder for the time being, and he has no need of fraudulent conveyances.
The third provision in these acts, which defines what hind of estate shall be saleable under execution, is in the section which directs the sheriff to convey the title. 1 Dig. L. K. 515. It declares that the conveyance made by the sheriff, as the law directs, “shall be effectual for passing to the purchaser, all the estate and interest, which the debtor had, and might lawfully part with in the lands.’1’’ This provision, and especially the last clause of it, is the *487 only one which can create any difficulty, in the sale of the estate in question. For it is argued, that as the Jaw stood at the passage of the act in question, the debtor, or land holder, could not by the statutes against champerty, sell and transfer the title which he held in lands, at the time in the adverse possession of others; and as the debtor could not part with such title by conveyance, it follows that the sheriff could not convey it.
Judge Mills’ dissent.
This argument though plausible, is not conclusive, and that'for the following reasons:
First: These acts are remedial, and ought to be liberally construed, and thus rendered beneficial to the creditor. If, therefore, it be conceded that this last clause, should appear to restrict the right of the sheriff to sell these lands, the expressions ought to be enlarged by,the former position, and broad expressions which we have noticed, so as to render the act consistent throughout; which will not be the case, if this latter clause exempts from sale, all lands of which the defendant in the execution had not at the time the possession in fact.
Secondly: It is well settled that a person claiming’ by deed, and not looking to his grantor for a title, holds adversely against his grantor, as well as the rest of the ,world. It is also settled that a fraudulent deed as between grantor and grantee, is good and that neither can impeach it; and the grantee holding possession under it cannot be evicted by the grantor, but holds adversely to him; nor can the grantor himself, after he has made such fraudulent grant, part with the lands. If then an execution was levied on those lands so fraudulently conveyed as the property of the grantor, and in possession of the fraudulent grantee, and they be sold, the purchaser .could not recover them, if the construction contended for is correct; because the estate at the time, was possessed adversely to the grantor, and because the grantor could not part witli the lands. Thus this construction of the statute would operate as a shield for fraud, and would protect the estate of a debtor, held adversely by his own family, under 4 fraudulent deed, and the statute to prevent frauds *488 and perjuries would and could afford no aid to the statute subjecting lands to the payment of debts; but the latter would operate as a virtual repeal of the former, so far as lands are concerned, contrary to the opinion of this court in the case of Beeler’s heirs vs. Bullitt’s heirs, 3 Marsh. 280, wherein it is held that the creditor may either go into equity first, to impeach a fraudulent deed of lands made by his debtor, or he may first sell the lands by fieri facias, and then contest the fraudulent deed by proceedings either at law or in equity.
Judge Milla’ dissent.
Thirdly: If it be granted that the debtor could not part with the title of lands adversely possessed at the passage of the acts subjecting lands to the payment of debts, and that of course the sheriff could not sell them, because the debtor could not then part with his interest therein; yet in a few years thereafter, and indeed in December, 1798, the statutes to prevent champerty were repealed, and the holders .of estates, adversely possessed, were thereby allowed to part with, or sell them, as has been heretofore held, both by this court and the supreme court of the nation. Now it is contended, that as the law subjecting lands to the payment of debts, was a general law then in force, whenever the legislature took away the unalienable quality of such estates, eo instante, they became subject to the general law, and the mark was placed on them which subjected them to execution; that is, their owners could part with them, and therefore could be made to part with them in payment of their debts by execution and sale. The moment they were allowed to traffic with their lands, and bring them into market for their own profit, their creditors could also bring the same estates into market without their consent. Such, it is insisted, would be the effect of these statutes when construed together, as statutes in pari materia, that is, regulating the alienable qualities of land titles; and it is believed similar instances might be formed of their construing the general statutes of the country. Suppose the legislature should now authorize the sale and conveyance of certain particular lands, not by deed but by livery of seisin or the delivery and acceptance of some symbol, and *489 should declare such estates for the time being, complete legal titles, would not these estates become at once, by the operation of the general laws subject to execution by fieri fcwias for debt, in the hands of their holders? It is conceived that they would, and if so, it will follow that, if the legislature annexes an alienable quality to estates before unalienable, that moment they become subject to execution.
J udge Mills’ cfis?ent.
• Fourthly: All these answers are predicated on the supposition that the premises, in the arguinent against the subjection of this estate by execution, are correct. But they ai'e not so, and it will how be shown that this estate of Taylor comes within the letter of this latter clause of the statute, and was an estate which he' could part with at all .times, even before the acts repealing the champerty laws, and at the date of the act subjecting lands to the payment of debts, even if they had been then adversely possessed.
The act of Virginia of 1788, 1 Dig. L. K. 215, designed to restrain champerty, although it prohibited the holder of a title adversely possessed, from general, sales of his estate to every one, yet it expressly permitted him to sell to the occupant; and the occupant could buy it. There was then never an hour at which the holder could not part with such an estate. His number of purchasers, it is true, was more limited than in the case of an estate not adversely possessed, but still there might be a purchaser and he could part with it, and the estate, therefore, comes within,the very letter of the act directing the sheriff to convey, and none can doubt that it comes within the mischiefs intended to be provided against.
But even jf all this Reasoning be mistaken, and I should concede that lands adversely possessed, not being alienable at the date of the acts subjecting lands to the payment of debts, could not, by the subsequent acts repealing the champerty laws be? come subject to sale by fieri facias, we shall soon see that the concession will do the appellees no good. For to avail themselves of the argument they must ¿shojv that they, or those under whom they claim, *490 were settled on the lands before the passage of the act of 1198, repealing the laws against champerty, p^cy have failed to do. For if they were not adversely possessed at that period, the subsequent entry and adverse possession could never render the lands unalienable in the hands of Taylor, or prevent his selling them to any purchaser, until their adverse possession was sufficiently long to toll his right of entry. For if we suppose these lands to be possessed by Taylor, or to be vacant at the date of the acts subjecting lands to the payment of debts, and till December, 1198, when the champerty acts were repealed, they were then alienable without any restriction, and after the adverse entry and possession of the defendant in this suit, they must still remain so, because there was no champerty act in force, and they were therefore, still subject to execution according to both the entire letter and spirit ■of the act directing the sheriff to convey. I have been thus particular in discussing this question, because this is the first time it has been discussed. But it is not the first time it has been presented to the courts and passed by in silence, and such sales have been enforced without a question; and the construction of these acts now contended for, has been the cotemporaneous construction, and if it is now tobe departed from, it is believed that it will unsettle many titles heretofore supposed to be safe, and even unhinge former adjudications, the consequence of which cannot be easily foreseen. To prove this, it .is only necessary to recur to the records of this court. A few of these cases only will be noticed, while it is believed many more might be found.
Judge Mills’ dissent.
The case of Coleman vs. Trabue, 2 Bibb, 518, was a sheriff’s sale enforced by ejectment against an adverse possession., held at the time of the sale, as will be .evinced by the case of Trabue vs. Kellar, which grew out of its concluding scenes, and will be clearly shown by examining the records. Yet this sale of 1000 acres of land, passed the judicial ordeal, without a question, but umst now be regained, if the construction contended for must prevail, because it was settled by an ejectment only. The case of Allen and others vs. Trimble, 4 Bibb, 21, was a tract *491 of upwards- of 2000 acres, the title to which, in the hands of the lessors of the plaintiff was acquired by execution, while adversely possessed under interfering claims, and enforced by ejectment against the tenants, after a- severe struggle, resting on every defect of title in the lessors by execution.. Yet judgment passed in the court below, and was afterwards affirmed in this court, without supposing that the adverse possession destroyed the sale. What is more remarkable in this case,, part of the tenants held under adverse older grants, and the claimants under the sale by execution filed their bill, asserting the superior equity of their entry.. There again, every plausible objection was taken to the title by sheriff’s sale, yet it prevailed; the entry was sustain-, ed, the sheriff’s title adjudged valid, and the- land was recovered, although the proof of adverse possession is full on the record; and that decree was affirmed by this court in the case of Spurr &c. vs. Trimble &c. 1 Marsh. 278. Another sale by execution has been sustained, in the case of Stevenson &c. vs. Robertson &c. fall term 1825, and by bill in equi-. ty, the adverse claim has been compelled to yield.. Among the numerous cases of this character, the ease of Trimble vs. Smith &c. 4 Bibb, 257, is not the least remarkable. There patent is arrayed against patent, and one who had never been in possession, recovered possession from the adverse junior patentee.' By the agreed case, it will appear that the patent of the lessor of the plaintiff issued to Alexander- and John M’Kinney in 1.7.85.; that Alexander conveyed to. John, and the land* was sold by fieri facias as the property of John in 1798;. to satisfy an execution in fav.or of William Scott, being the same-sale sustained by this court in the case of M’Kinney vs. Scott, 1 Bibb, 155, and Scott having purchased conveyed to Trimble, the lessor of the plaintiff, It. is further agreed that Boswell, under the patentee, Smith, was in actual adverse- possession, nineteen years before suit brought,, that is from the year 1794, till the trial, that is four years before the sheriff’s sale, at the time thereof, and ever since. Thus this question was fairly presented on. the face of the record, yet the court gave judgment enforcing the *492 sale, and Trimble recovered against the adverse pos'1-' sessor. But I cannot pass by the case of Morgan’s heirs vs. Patton &c. so recently decided at the last term, in which Morgan had brought his ejectment against some tenants, adversely possessing his land and obtained his judgment without service of process, which judgment was reversed at. his costs, on a writ of error; and under the execution for these costs, his title was sold by the sheriff while the tenants were still residing upon the land, and Allen, who was not a tenant, became the purchaser, and took the conveyance, and afterwards sold and convoyed to the tenants in possession, against whom Morgan's heirs brought their second ejectment, to contest this sale, and the title conveyed by the sheriff is supported, and Morgan’s heirs were defeated, although the land was possessed by these same tenants, when the land was sold by execution and bought by a stranger, the possession notwithstanding, and after every struggle against the title thus acquired, and in that case it is expressly held, lotidem vsrbis that “ the deed of the sheriff was supported by the judgment and execution given in evidence. It was sufficient to divest the title of Morgan and vest it in Allen.”' This could not be correct, if a sale of land by execution, adversely possessed, can pass no title.
J udge Mills’ dissent.
JinIge Mins’ dissent.
From these few cases, out of many, the following reflections naturally arise. There have been many sales of such titles, and under them the land has been recovered, and to declare all such invalid now, must shake the tenure of much property, and disquiet many estates. It is also evident, that the construction of the statutes now contended for, was the cotemporaneous exposition of the laws subjecting lands to the payment of debts, and no member of the bar, for thirty-five years, has been found bold enough to question it, nor has it once entered the judicial mind, that such sales were invalid, else why did the question sleep or escape so often? It is true, all these cases are silent as to the particular question now under discussion, and the courts have gone on enforcing one of those sales after another, without being halted at the adverse possession at the time of the sale. But this silence speaks loudly *493 oiithe subject, and admonishes us, that such sales have never been questioned, till they have wound themselves into many of our titles, and that, to overturn them now, may be of very serious consequences to many estates, held, and enjoyed, and long settled under them. To let them now go on, will be a measure of repose, and will only be advancing the objects of the acts, subjecting lands to the payment of debts, and will be converting this fund of outstanding titles in the hands of debtors, which they themselves can sell, and enjoy the procéeds, into a fund for the payment of their debts. I may still be told, that 'in these cases, the question was not raised, and expressly decided. But why was it not.? It must either have been seen by the bar and court, and been passed by dishonestly by both, which is wholly inadmissible; or it was never seen at all, because it was hard to be seen or discovered; or being seen, it was believed to be untenable. The conclusion is irresistable, that the construction I contend for, has been the undisturbed construction, by acquiescence at least, for nearly forty years; et cotemporanea expodtio est firtisdma in lege. One thing cannot be doubted by any one who will take the trouble of looking into the records of this court, in the cases I have cited. The question was fairly presented in the most or all of them, and yet escaped notice: a strong evidence that it is unworthy of notice.
Judge'Mills’ dissent.
Crittenden, for appellant; Triplett, for appellee.